FILED

2009 JUL 27 PM 1:55

CLERK U.S. DISTRICT COURT
CENTRAL DIST. C CALIF
LOS ANGELES

BY_____

1  Michael D. Braun (Bar No. 167416)
   **BRAUN LAW GROUP, P.C.**
2  10680 W. Pico Boulevard, Suite 280
   Los Angeles, CA 90064
3  Phone: (310) 836-6000
   Fax:   (310) 836-60106
4  E-Mail: service@braunlawgroup.com

5  Janet Lindner Spielberg (Bar No. 221926)
   **LAW OFFICE OF JANET LINDNER SPIELBERG**
6  12400 Wilshire Blvd., Suite 400
   Los Angeles, CA 90025
7  Phone: (310) 392-8801
   Fax:   (310) 278-5938
8  E-Mail: jlspielberg@jlslp.com

9  Joseph N. Kravec, Jr. (*Pro Hac Vice Application Pending*)
   **SPECTER SPECTER EVANS**
10     **& MANOGUE, P.C.**
   436 Seventh Avenue
11 Pittsburgh, PA 15219
   Phone: (412) 642-2300
12 Fax:   (412) 642-2309
   E-Mail:  jnk@ssem.com
13

14 *[List of attorneys continued on signature page]*

15 **Attorneys for Plaintiff**

16              **UNITED STATES DISTRICT COURT**

17            **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 18  MICHAEL PARISER, a California citizen, on behalf of himself and all others similarly situated, | CASE NO. CV09-5467 CBM (CWx) |
| 19 | |
| 20                  Plaintiff, | CLASS ACTION |
| 21         vs. | **CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL** |
| 22 | |
| 23  CAREFIRST OF MARYLAND, INC., a Maryland corporation, and GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., a District of Columbia corporation, collectively doing business as CAREFIRST BLUECROSS BLUESHIELD, | |
| 24 | |
| 25 | |
| 26 | |
| 27                  Defendants. | |
| 28 | |

COPY

1    Plaintiff, Michael Pariser, by his attorneys, brings this action against Defendants,

2  CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc.,

3  collectively doing business as Carefirst BlueCross BlueShield (hereinafter "CareFirst" or

4  "Defendant"), on behalf of himself and all others similarly situated, and alleges as

5  follows based upon the investigation of his counsel:

6

7                                           I.

8                                   **INTRODUCTION**

9        1.      This is a class action seeking redress for CareFirst's unlawful practice of

10  systematically underpaying "out-of-network" non-MD health care providers for their

11  services.  Patients covered under CareFirst's health plans (a/k/a "insureds") have the

12  option of using non-MD health care providers who are "in-network" or "out-of-

13  network."  In-network non-MD health care providers have agreed with CareFirst to

14  accept pre-negotiated reimbursement rates as payments in full for their services.  Out-of-

15  network non-MD health care providers are not so limited and are entitled to be paid by

16  CareFirst at the "usual, customary and reasonable" ("UCR") rate.

17        2.      CareFirst, operating under the trade name CareFirst BlueCross BlueShield,

18  is the Mid-Atlantic's largest health care insurer, insuring and administering individual

19  and commercial (employer sponsored) health benefits to more than 3.2 million members

20  in Maryland, the District of Columbia, and Northern Virginia.  Out-of-network providers

21  in all 50 states, including Plaintiff Pariser, obtain payments from CareFirst by receiving

22  assignments from their patients of the right to make a claim for the provider's service

23  under their patients' CareFirst health insurance.

24        3.      CareFirst uses and has used claims-support databases created by Ingenix,

25  Inc., a wholly owned subsidiary of UnitedHealthcare Group, Inc., one of the nation's

26  largest insurers, to calculate the UCR rate for out-of-network providers.  An

27  investigation by the New York Attorney General, Andrew Cuomo, revealed that

28  Ingenix's databases are intentionally skewed to lower the UCR rates through, *inter alia*,

                                          1

faulty data collection, poor pooling procedures and the lack of audits to ensure the integrity of the data collected from CareFirst and other insurers. Cuomo's investigation concluded that use of UCR rates obtained through Ingenix's databases resulted in underpayments of as much as 10-28%.

4.     Following on the heels of the attorney general investigation, on March 26 and 31, 2009, Senator John D. Rockefeller, IV, presided over Senate hearings investigating health insurers' out-of-network rate practices. The Senate weighed evidence that health insurers had routinely underpaid their insureds for out-of-network health care. The chief executive of UnitedHealthcare and Ingenix were questioned about the quality of Ingenix's databases and, specifically, about "data laundering" – the selective use of doctors' bills to determine out-of-network payments. Senator Rockefeller characterized the insurers' out-of-network rate practices as "outright fraud" and said the hearings were meant to determine whether more federal oversight of insurers is necessary to protect consumers.

5.     Most of the Ingenix data used by insurers to determine UCR amounts was supplied by Ingenix's parent company and Aetna. These insurers recently agreed to pay $70 million to set up a new database for determining UCR reimbursement amounts. Other insurance companies investigated by the New York Attorney General agreed to make substantial monetary contributions to the development of a new database program and to stop using the Ingenix databases. The new database will be owned and operated by a non-profit organization to eliminate insurance company conflicts of interest. However, the creation of this new database has yet to occur.

6.     CareFirst has not contributed to the creation of this new database. Nor has it agreed to stop using Ingenix databases even once the new database is available. Indeed, CareFirst continues to use Ingenix's and other unreliable data to set UCR rates and to make payments to "out-of-network" health care providers, including Plaintiff Pariser. As a result of CareFirst's use of incomplete, unreliable and inaccurate Ingenix and other unreliable data to set UCR rates, out-of-network health care providers have

1    been and continue to be short-changed millions of dollars that they are entitled to be and
2    should be paid.

3        7.    In addition, CareFirst's systematic underpayment of out-of-network non-
4    MD health care providers resulting from its reliance on Ingenix and other faulty data had
5    and continues to have the intended effect of discouraging its insureds from choosing to
6    use the out-of-network providers because by improperly lowering out-of-network
7    reimbursements CareFirst thereby increases unpaid amounts for which its insureds
8    would be financially responsible.  CareFirst's serial underpayment of out-of-network
9    UCR amounts also pressured and continues to pressure non-MD health care providers
10   who otherwise would have remained out-of-network to join CareFirst's network of non-
11   MD health care providers and accept CareFirst's discounted contract reimbursement
12   rates.  Those "out-of-network" non-MD providers who resist joining CareFirst's network
13   are still pressured: a) to enter agreements with CareFirst to accept improperly low out-of-
14   network reimbursements in lieu of incurring the delay of receiving any payments
15   whatsoever while fighting CareFirst for proper reimbursements or otherwise waiting for
16   CareFirst to process their payments, and b) to accept a lesser amount than their usual,
17   customary and reasonable rate for their services so that their patient's out-of-pocket
18   payments to the non-MD provider after CareFirst's low reimbursements are affordable
19   enough such that the patient is able to continue treatment.

20       8.    Plaintiff Pariser is an out-of-network licensed psychologist who has been
21   and continues to be underpaid and to lose potential patients by CareFirst's use of
22   Ingenix's and other faulty data to process his claims.  He brings this class action on
23   behalf of all out-of-network non-MD health care providers practicing in the United
24   States who are not licensed medical doctors and who, during the applicable limitations
25   period, submitted claims for payment of their health care services to CareFirst and were
26   paid less than the amount submitted on their claim (collectively, the "Class" or "Class
27   Members").

28

9.    Plaintiff Pariser alleges that CareFirst's wrongful underpayments violated and continue to violate its legal obligations to him and the Class, as health care providers and as assignees and beneficiaries of their patients' benefits, under the Employee Retirement Insurance Security Act of 1974 ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Sherman Antitrust Act, and the California Unfair Competition Law ("UCL"), as described herein.

10.    Plaintiff seeks for himself and the Class restitutionary relief, damages and treble damages, and other remedies for CareFirst's unlawful conduct.  Plaintiff also seeks for himself and the Class injunctive and declaratory relief to enjoin CareFirst from continuing to use Ingenix or other unreliable data to determine UCR rates for payments. Alternatively, to the extent CareFirst is permitted to continue to use Ingenix or other unreliable data to make reimbursement payments in the interim prior to the creation and implementation of a new reliable data, Plaintiff seeks injunctive and declaratory relief declaring that those payments to non-MD "out-of-network" providers are not final and that CareFirst is obligated to pay the difference between any underpayment based on the old faulty data once the new reliable database is implemented.

## II.

## JURISDICTION AND VENUE

11.    ERISA governs the rights and duties of insurance companies and CareFirst's insureds of employer sponsored health care plans. 29 U.S.C. § 1132. This Court has jurisdiction of those claims under 29 U.S.C. § 1132(e).

12.    Subject matter jurisdiction also exists under both 28 U.S.C. § 1331 and § 1332(d).  Plaintiff's ERISA, RICO and Sherman Act claims raise federal questions under Section 1331.  Moreover, diversity jurisdiction exists under Section 1332(d).  Plaintiff is a citizen and resident of the State of California, residing in Los Angeles County where he also is a practicing psychologist and, similar to all other members of the Class, has received and continues to receive reimbursements as an out-of-network provider to

4

1  Defendants subject to the wrongful conduct described in this Complaint. Defendants are

2  incorporated with their principal places of business in the State of Maryland and the

3  District of Columbia. The amount in controversy in this action for Plaintiff and the

4  Class, when aggregated, exceeds $5,000,000, exclusive of interest and costs.

5      13.    Venue is appropriately established in this District under 29 U.S.C.

6  § 1132(e)(2), 28 U.S.C. § 1391, § 1965 of RICO, and 18 U.S.C. § 1965, because

7  CareFirst conducts a substantial amount of business in this District, and has and

8  continues to make reimbursements in this District to Health Care Providers, including to

9  Plaintiff and numerous members of the Class, subject to the wrongful conduct described

10 in this Complaint.

11

12                              **III.**

13                        **THE PLAINTIFF**

14     14.    Plaintiff, Michael Pariser, is a citizen of the State of California who resides

15 in Los Angeles County, California. At all relevant times since 2000, Plaintiff has been

16 and continues to be a licensed non-MD psychologist practicing in Los Angeles County

17 who has never been part of CareFirst's network of health care providers and therefore

18 has and continues to be deemed an out-of-network provider for CareFirst. During that

19 time, Plaintiff has treated and continues to treat patients who were and are insureds under

20 individual and employer sponsored CareFirst health insurance policies from whom

21 Plaintiff received and continues to receive assignments and then reimbursements from

22 CareFirst for his services. Plaintiff believes that these reimbursements have been and

23 continue to be lower than they should be based on CareFirst's wrongful conduct alleged

24 in this Complaint.

25 / / /

26 / / /

27 / / /

28 / / /

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

## IV.

## THE DEFENDANT

15.    Defendant CareFirst of Maryland, Inc., formerly known as Blue Cross and Blue Shield of Maryland, Inc., is one of two subsidiaries of CareFirst, Inc. operating under the trade name CareFirst BlueCross Blue Shield.  CareFirst of Maryland, Inc. is a Maryland corporation, has its corporate headquarters at 1501 S. Clinton St. in Baltimore, Maryland and is an independent licensee of the Blue Cross and Blue Shield Association, or BCBSA, an association of independent health benefit plans.  CareFirst of Maryland, Inc. had an estimated annual revenue of over $1.9 billion in 2008 alone.

16.    Defendant Group Hospitalization and Medical Services, Inc. is the second subsidiary of CareFirst, Inc. operating under the trade name CareFirst BlueCross Blue Shield.  Group Hospitalization and Medical Services, Inc. is a District of Columbia corporation, has its corporate headquarters at 840 Fist St. NE in Washington, DC. Defendant Group Hospitalization and Medical Services, Inc., and is an independent licensee of the Blue Cross and Blue Shield Association, or BCBSA, an association of independent health benefit plans.  Group Hospitalization and Medical Services, Inc. had an estimated annual revenue of over $2.8 billion in 2008 alone.

17.    Together, Carefirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., operating under the trade name CareFirst BlueCross BlueShield, is the Mid-Atlantic's largest health care insurer, insuring and administering individual and commercial (employer sponsored) health benefits to more than 3.2 million members in Maryland, the District of Columbia, and Northern Virginia.

## V.

## FACTS COMMON TO ALL COUNTS

A.    *Out-of-Network Non-MD Health Care Providers.*

18.    Non-MD health care providers can either enter into an agreement with CareFirst, in which case they are deemed "in-network," or they can provide services to

CareFirst's insureds without any contract with CareFirst governing that relationship, in which case they are deemed "out-of-network."

19.    Non-MD health care providers who are in-network have signed contracts with CareFirst to provide health care services to its insureds at reduced rates in exchange for access to CareFirst's patient base, among other things. In-network providers receive reimbursement of eligible charges directly from CareFirst. When visiting an in-network provider, insureds are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service. CareFirst usually pays less money when its insureds use an in-network provider, because those providers have agreed to provide their services at lower cost to CareFirst's insureds.

20.    Non-MD out-of-network providers are health care providers who do not have a contract to provide health care services to CareFirst's insureds. Because no specific reimbursement rate has been agreed to by the provider, out-of-network providers are not required to accept reduced rates for their services and can instead charge any amount they choose. Out-of-network providers may then collect their full charges directly from patients at the time of service or may agree to accept an assignment of benefits, which occurs when an insured authorizes their insurance company to remit payment directly to the health care provider for the covered services. Out-of-network providers are entitled to bill the patient for any amount exceeding the amount covered by insurance.

21.    While out-of-network providers may bill the retail cost of their services, CareFirst does not necessarily pay the total amount billed. Rather, CareFirst pays on a fee for service basis that is equal to the lesser of the out-of-network provider's billed charges or a percentage of the UCR amount as determined by CareFirst.[1]

22.    The UCR amount is supposedly determined based on a review of the prevailing charges made by peer providers for a particular medical or health service by a

---

[1] While the language used to define UCR may differ somewhat across CareFirst's various Evidence of Coverage, the meaning as interpreted and applied by CareFirst is the

specific type of provider within a specific community or geographical area. The UCR amount is the maximum amount CareFirst will consider eligible for reimbursement of out-of-network providers (the so-called "allowed charge"), and is typically determined by CareFirst through its use of Ingenix databases, although occasionally by the use of Medicare data.

**B.    *The Ingenix Databases.***

23.    CareFirst primarily calculates UCR rates for out-of-network providers by using databases that are owned and operated by a third party, Ingenix, Inc. ("Ingenix"). Ingenix is owned by America's largest health insurance company, UnitedHealthcare Group. These databases are known as the Prevailing Healthcare Charges System ("PHCS"), which Ingenix purchased in 1997, and Medical Data Research ("MDR"), which Ingenix purchased in 1998 (collectively, "Ingenix databases").

24.    The PHCS database was produced and has been marketed to insurers, including CareFirst, since 1973. However, its prior owner, Health Insurance Association of America ("HIAA"), informed CareFirst and other data purchasers that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose. In fact, HIAA released its data with a disclaimer that specifically stated, in relevant part, that the data was being provided to members [i.e., insurers such as CareFirst] for informational purposes only. HIAA disclaimed any endorsement, approval or recommendation of the data, or its use to determine "usual and customary" charges. Once Ingenix acquired PHCS from HIAA in 1998, it continued to use substantially the same disclaimer in its communications with insurers including CareFirst, as set forth in paragraph 30 below.

25.    Ingenix produces two cycles of data a year, which include medical, surgical, anesthesia, and dental data as well as the HealthCare Financing Administration's common procedure coding system services ("HCPCS").

_____

same.

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

26.    The Ingenix databases are purportedly designed to collect and report actual charge data by health care providers for out-of-network health care services from which UCR amounts can be determined.  For some services, the Ingenix databases feature "derived data," which uses relative values and averages of charges for a number of procedures in the same "bodily area" as the procedure for which a derived amount is calculated.

27.    The Ingenix databases are based on charge data contributed to Ingenix by health plans, including UnitedHealthcare (the parent company of Ingenix), Aetna, Cigna, CareFirst, and other insurance payors who also use the final published data to price out-of-network claims as UCR.

28.    Certain data contributors, including CareFirst, send less-than-complete and/or extensively pre-edited charge data to Ingenix, skewing the data downward to the detriment of out-of-network providers like Plaintiff Pariser whose UCR rates are artificially lowered by insurers using the Ingenix databases.  Ingenix was aware of the pre-editing and other improper practices engaged in by its data contributor health plans. Nevertheless, Ingenix failed to audit its data contributor health plans or take other steps to ensure completeness and accuracy of their data.  In addition, Ingenix itself also extensively edited this data, which further contributed to its invalidity and inaccuracy.

29.    Whenever CareFirst uses the Ingenix databases to determine UCR amounts, CareFirst relies on the Ingenix data alone and gives no consideration to the increased severity or complexity of a specific case, which is necessary for a proper determination of the UCR amount.  CareFirst systematically failed to disclose this critical information to Plaintiff Pariser, the Class, its insureds and regulators.

30.    CareFirst also systematically failed to advise its insureds and out-of-network providers that the Ingenix data it used to establish UCR amounts is produced with the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to insureds for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. **There is**

9

1
2
3

**neither a stated nor an implied 'reasonable and customary' charge (either actual or derived)** . . . . Any interpretation and/or use of the data by the subscriber is solely) and exclusively at the discretion of the subscriber. (Emphasis added).

4  31.   Even though Ingenix informed CareFirst and other data users that they

5 cannot "represent" the Ingenix data other than as described in the disclaimer, CareFirst

6 used and represented the Ingenix data inconsistent with the disclaimer as being an

7 accurate method for determining UCR amounts.

8  32.   Throughout the Class Period, CareFirst used the Ingenix data as its primary

9 basis for making its UCR determination for the payment of claims to out-of-network

10 providers on its own health insurance policies and those self-insured plans it

11 administered, even though CareFirst knew or should have known that the data could not

12 and should not have been used for that purpose and, as with the Medicare data, was not

13 properly designed to determine UCR reimbursement amounts.  CareFirst obtained the

14 data from Ingenix, loaded the data onto its internal claims-processing platforms,

15 accessed that data and resolved claims automatically based on that data, through auto-

16 adjudication – an automated, paperless and humanless process.

17  33.   CareFirst's claims processors simply entered certain claim information into

18 their computers to access the Ingenix databases, which then displayed a dollar amount

19 Ingenix calculated for each procedure code at the applicable percentage.  CareFirst used

20 this Ingenix amount as the UCR amount.

21  34.   There are a number of inherent flaws in the Ingenix data that makes it an

22 invalid and inappropriate basis for setting UCR amounts, chief among them the data only

23 includes four points:  date of service, CPT Code, address where service was performed,

24 and the amount of the provider's billed charges.  In addition, the Ingenix database:

25  a.   Does not determine the numbers or types of providers in any

26      geographic area;

27  b.   Does not determine the actual types of procedures within a

28      geographic area;

10

1      c.    Collects charge data that is not representative of the actual number of

2           procedures performed within a geographic area;

3      d.    Does not collect sufficient data to enable its users to determine

4           whether the data reflects the charges of providers with any particular

5           degree of expertise or specializations;

6      e.    Does not collect sufficient provider-specific data to enable its users to

7           determine whether the charges are from one provider, from several

8           providers, or from only a minority or specific subset of the providers

9           in a geographic area;

10     f.    Does not collect patient specific information such as age or medical

11          history or condition;

12     g.    Does not ascertain the most common charge for the same service or

13          comparable service or supply;

14     h.    Does not determine the place of service or type of facility;

15     i.    Does not collect sufficient data to enable it or its users to determine

16          an appropriate medical market for comparing like charges;

17     j.    Combines zip codes inappropriately, and uses zip codes instead of

18          appropriate health care markets;

19     k.    Fails to compare procedures that use the same or similar resources

20          (and other costs) to providers but, rather, indiscriminately combines

21          all provider charges by procedure code without regard to such

22          factors;

23     l.    Fails to compare procedures of the same or similar complexity by,

24          among other things, failing to record or account for CPT code

25          modifiers;

26     m.    Does not use an appropriate statistical methodology;

27     n.    Does not properly consider charging protocols and billing practices

28          generally accepted by the health care community or specialty groups;

11

o.     Does not properly consider health care costs in setting geographic areas;

p.     Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

q.     Is subject to pre-editing by data contributors;

r.     Is subject to additional editing by Ingenix;

s.     Reports charges that are systematically skewed downward;

t.     Uses relative values and conversion factors to derive inappropriate UCR amounts;

u.     Uses a methodology that does not comply with CareFirst's contractual definition of UCR;

v.     Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by non-MD health care providers, insureds or other employers;

w.     Cannot determine from its pooled data the number or percentage of providers furnishing billed charge data;

x.     Fails to consider the provider's usual charge;

y.     Lacks the ability to incorporate into its analysis the provider's licensure, specialty training, or experience;

z.     Does not account for complexity of a patient's specific treatment or condition or the degree of skill or expertise needed for the particular service;

aa.    Fails to collect data regarding the range of services or supplies provided by a facility; and

bb.    Does not collect data regarding rates based on cost factors or the cost of providing the same or similar service or supply or the prevailing charge level for any provider or service.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

35.    These and other flaws render CareFirst's use of Ingenix data invalid and unlawful for determining UCR amounts.  CareFirst knew or should have known of these flaws in the Ingenix data.  CareFirst recognized the overwhelming problems involved with using Ingenix's databases to calculate UCR amounts due to Ingenix's failure to collect or utilize data other than the four data points.  CareFirst, Ingenix, other insurers and HIAA discussed expanding the data to include more data points.  Ingenix attempted to collect additional data, but was unable to get additional data from all of its data contributors, and did not incorporate the data it did receive into its databases.

36.    Nevertheless, CareFirst continued to use Ingenix's faulty databases, without advising its insureds or providers of the many flaws in the Ingenix data, including its use of only four data points.

37.    In using the Ingenix data, CareFirst elevated its own financial self-interest over the best interests of its insureds and their providers.  When deciding a claim for out-of-network benefits, CareFirst operates under a conflict of interest.  First, every dollar paid to an out-of-network provider is one less dollar for CareFirst, so it systematically and without justification is encouraged to and does reduce the value and hence the payment of out-of-network benefits through the use of Ingenix products.  Second, CareFirst's core product is its network of non-MD health care providers, which it attempts to preserve by discouraging the use of out-of-network providers by systematically and without justification reducing the amount it will pay for out-of-network benefits by using Ingenix to lower the UCR amounts for out-of-network providers.  In other words, the more an insured has to pay to go to an out-of-network provider over an in-network provider, the more likely that insured is to stay in-network.

38.    During the Class Period, CareFirst has and continues to improperly use the Ingenix databases to set reimbursement rates for out-of-network claims in the following ways, resulting in adverse benefit determinations that damaged Plaintiff Pariser and the Class:

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

a.   By using Ingenix data from a different geographic area if there was no Ingenix provider charge data available for the geographic area where a particular service was rendered to an insured.

b.   By using outdated versions of the Ingenix databases to determine UCR amounts for its insured.

c.   By setting UCR amounts for out-of-network claims knowing that some Ingenix data contributors, including CareFirst, deleted "high" provider charges for health care services from the data they submitted to Ingenix for use in the Ingenix database.

d.   By setting UCR amounts for out-of-network claims knowing that Ingenix further had manipulated its databases by deleting (i) additional valid "high" charges by non-MD health care providers and (ii) significantly more "high" charges than "low" charges.

e.   By setting UCR amounts for out-of-network claims knowing that Ingenix had deleted from its databases provider charges that contained health care claim coding "modifiers," which indicate procedures or services with special complications that often warrant a higher UCR amount.

f.   By setting UCR amounts for out-of-network claims knowing that Ingenix failed to audit the data it received from data contributor health plans to ensure that they had submitted all appropriate data and had improperly reported negotiated or discounted rates that providers charged for health care services rather than charges actually billed by providers.

g.   By setting UCR amounts for out-of-network claims knowing that Ingenix used a deficient methodology to "derive" additional provider charges in the databases beyond the charges actually reported by Ingenix data contributor health plans to Ingenix. Ingenix's use of

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defective data to "derive" such additional provider charges caused the resulting rates to be defective and improper for use in setting reimbursements for health care services.

39.    During this period, CareFirst may have and may be continuing to also, to a lesser extent, set UCR rates based on Medicare rate data. As with the Ingenix databases, this Medicare data was not designed to and could not establish valid UCR amounts. Such rates are therefore not a proper or legitimate method for reducing Plaintiff's and the Class Members' claimed amounts.

40.    By systematically and typically making UCR determinations without compliant and valid data to substantiate its determinations, CareFirst has breached and continues to breach its obligation to reimburse Plaintiff Pariser and the Class for out-of-network services they provide to CareFirst's own insureds or insureds of self-insured plans that CareFirst administers. Accordingly, all past UCR determinations based on such noncompliant data should be overturned, and CareFirst should be enjoined from continuing to make UCR determinations based on such noncompliant data.

41.    Upon information and belief, as a further means of reducing out-of-network reimbursement to out-of-network providers during the Class Period, CareFirst knowingly uses outdated or "old" Ingenix data to price out-of-network claims.

42.    It is further believed that CareFirst also sometimes does not use the Ingenix data if that data does not report a certain number of charges for a given CPT code, instead applying its own claims platform to determine the UCR amount if the number of charges in the Ingenix data triggered the use of its default formula. At times, these platforms utilize out of date data and data even more flawed than ordinary Ingenix data to determine the UCR amount.

43.    Additionally, it is believed that if the Ingenix data fails to provide the minimum number of data points, CareFirst's claim systems during the Class Period have applied and continue to apply CareFirst's own "default" formulas to calculate the UCR.

44.    CareFirst has and does not disclose that it used "default" formulas or other "behind-the-scenes" programs to establish UCR amounts during the Class Period.  In fact, CareFirst insureds as well as Plaintiff Pariser and the Class had no way of knowing that a "default" formula or "behind-the-scenes" program had been used to price UCR, nor the method inherent in a "default" formula or other "behind-the-scenes" program to price UCR, which violates CareFirst's obligations to both the insureds and the health care providers.

45.    During the Class Period, it is also believed that CareFirst uses or used platforms that apply different rounding rules for establishing UCR rates, which results in CareFirst calculating inconsistent UCR amounts despite the fact that the calculations were made for the same date, same procedure in the same geographic area.

46.    By its use of Ingenix data and other improper out-of-network pricing methods to reduce reimbursements during the Class Period, CareFirst violated, and continues to violate, its legal obligation to Plaintiff Pariser and the Class.

47.    CareFirst never disclosed the misconduct described in this Complaint regarding its UCR determinations for reimbursements to out-of-network providers such as Plaintiff Pariser or Class Members and instead employed a pattern of non-disclosures and misrepresentations to actively conceal its misconduct from them.  Indeed, the details of how CareFirst determined UCR rates, including the data it relied on for those UCR determinations and knowledge of its inherent flaws, were in the sole possession of and known only to CareFirst and its co-conspirators.  This information was not disclosed to providers, insureds (under individual policies or as participants or beneficiaries of employer-sponsored plans), or their assignees, including Plaintiff Pariser and the Class.

48.    CareFirst's and its co-conspirators' secrecy about how UCR determinations were made prevented providers, insureds (under individual policies or as participants and beneficiaries of employer-sponsored plans), and assignees thereof, including Plaintiff Pariser and the Class, from challenging or suspecting they had any good cause to challenge CareFirst's UCR determinations.  In other words, in the absence of any

1  information to the contrary, they were left to unsuspectingly rely on the integrity of

2  CareFirst's UCR determinations.

3      49.    CareFirst's and its co-conspirators' complete concealment from providers

4  and insureds of its misconduct as described herein successfully continued until only

5  recently when the New York Attorney General first announced its industry-wide

6  investigation and report of several insurers relying on faulty Ingenix and other data to

7  determine and seriously understate UCR reimbursement rates for out-of-network

8  providers, causing Plaintiff and the Class to be deprived of appropriate payments due

9  them as out-of-network providers or assignees under the terms of their patients'

10  individual  policies or employer-sponsored benefit plans.  However, neither the New

11  York Attorney General nor any insurer has yet to reveal all of the details or the entire

12  extent of the misconduct at issue in this action.  Indeed, CareFirst was not even identified

13  as one of the targets of the New York Attorney General's investigation.

14      50.    CareFirst failed to disclose and misrepresented and continues to fail to

15  disclose and misrepresent to Plaintiff Pariser and the Class material information

16  regarding out-of-network determinations in violation of ERISA, RICO, the Sherman Act,

17  and federal common law.  By not providing Plaintiff and the Class an accurate

18  explanation of the basis for their UCR or other out-of-network determinations, CareFirst

19  failed and continues to fail to provide the "full and fair review" required by ERISA.

20  CareFirst has also illegally agreed with Ingenix that neither will disclose the Ingenix

21  database information so that they can conceal the defects from insureds and providers

22  alike.

23      51.    CareFirst violated and continues to violate various fiduciary, statutory, and

24  common law duties to Plaintiff Pariser and the Class by using faulty data to make UCR

25  determinations on which they purportedly relied on to deny their assigned benefits, by

26  failing to make decisions untainted by their own self-interest, and by not providing a full

27  and fair appeals process since the flaws in the underlying data on which CareFirst

28

1  purportedly relies on to deny assigned benefits and its affect on the UCR and ultimate

2  reimbursement to out-of-network providers are not disclosed.

3  **C.    *Investigation into the Ingenix databases.***

4    52.    A recently concluded investigation of Ingenix's databases by New York

5  Attorney General, Andrew Cuomo, confirmed that "the Ingenix databases in fact under-

6  reimburse consumers." January 13, 2009 New York Attorney General Health Care

7  Report, "THE CONSUMER REIMBURSEMENT SYSTEM IS CODE BLUE."

8    53.    According to the Attorney General's report, an analysis of the New York

9  market showed that insurers that used Ingenix and other similar methods to determine

10  UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

11    54.    "When extrapolated across the State and the country, it is fair to say that

12  Ingenix databases have caused Americans to be under-reimbursed to the tune of at least

13  hundreds of millions of dollars over the past ten years." *Id.*  Non-MD health care

14  providers, like Plaintiff and the Class, and the insureds, of course, are the primary

15  victims of this under reimbursement scheme.

16    55.    Moreover, CareFirst's continuous underpayment of out-of-network claims

17  has interfered with Plaintiff's and the Class' relationships with their patients, the

18  insureds. Mr. Cuomo agreed:

19          The responsible consumer reads the plan documents and sees a
           thicket of words. One term seems intelligible: the "usual and
20          customary rate" of a similar physician for a similar service in a
           similar area. That sounds reasonable. The consumer makes
21          the leap out-of-network and submits the bill to the insurer only
           to be told the consumer will not be fully reimbursed because
22          the doctor's charge exceeded the usual and customary rate.
           The fog of ignorance continues, thanks to the insurer. **The**
23          **physician-patient relationship is undermined, as the**
           **physician has been branded a charlatan whose bills are**
24          **inflated. No one's interests here are advanced, except**
           **perhaps when next time, the consumer decides to stay in**
25          **network for fear of what bills may accrue for out-of-**
           **network care. The interests advanced in that event are**
26          **those of the insurer, whether by accident or design.**

27  *Id.* (emphasis added).

28

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

56.   In discussing where the blame for this under-reimbursement scheme should lie, the New York Attorney General explained: "[T]he fault cannot be laid on Ingenix alone.  All industry members have benefited unfairly at the expense of consumers over the past ten years, **and they continue to benefit unfairly from a rigged system day after day**." *Id.* (emphasis added).  CareFirst, as a significant beneficiary of the Ingenix database, should therefore be held accountable for and enjoined from its use of the database to under-reimburse Plaintiff Pariser and the Class.

57.   Simultaneous with or soon after the release of the New York Attorney General's findings, UnitedHealthcare, the owner of the Ingenix database, and 10 other insurers settled the New York Attorney General's, and the American Medical Association's ("AMA") and others' claims concerning insurers' use of Ingenix's databases to determine UCR amounts.  As part of the attorney general settlements, these settling insurers agreed to pay millions of dollars toward the creation of an independent non-profit organization to develop, own and operate a new database to be used for UCR determinations.  This new database will be designed to replace the Ingenix databases and provide reliable data for determining UCR rates for out-of-network reimbursements.  CareFirst has neither agreed to contribute to the creation of this new, unbiased method for UCR determination, nor has it promised to stop using the Ingenix database at any time in the future.  CareFirst continues to use Ingenix and other faulty data to determine UCR rates and to reimburse out-of-network providers such as Plaintiff Pariser and the Class.

58.   Upon information and belief, UnitedHealthcare also agreed to pay approximately $350 million to settle claims brought by a class of consumers and providers, the AMA and others, related to the underpayment of UCR amounts for out-of-network health care services.

59.   Upon information and belief, other insurers remain under investigation by the New York Attorney General for similar conduct.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

60.    Congress is actively investigating the use of Ingenix's databases in setting UCR amounts.  Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Pay For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for out-of-network non-MD health care providers. [2]

61.    At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option – through higher premiums and higher cost sharing.  There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option.  One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not.  The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area.  Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

/ / /

/ / /

---

[2] A true and correct copy of the Committee on Commerce, Science and Transportation, Office of Oversight and Investigations' Staff Report on *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009) is attached hereto as Exhibit A and incorporated herein.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

Senate Committee on Commerce, Science, and Transportation, "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?," March 31, 2009.

62.    Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of Ingenix's databases to pay far less than the UCR amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Mr. Slavitt's company, Ingenix.

Senate Committee on Commerce, Science, and Transportation, "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?," March 31, 2009.

63.    In light of the insurance industry's fraudulent use of Ingenix's databases in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary. For now, however, the only avenue of redress for insureds and their health care providers, such as Plaintiff Pariser and the Class, is through the courts.

## VI.

## PLAINTIFF MICHAEL PARISER

64.    Plaintiff, Michael Pariser, is a licensed psychologist who practices and resides in Los Angeles, California. It is believed and therefore averred that Plaintiff Pariser has obtained assignments of benefit payment rights from an insured covered under individual health care plan not subject to ERISA and from an insured under

21

employer sponsored health care plan subject to ERISA that was insured and/or administered by CareFirst, including a plan where CareFirst functions as a plan administrator under ERISA. Plaintiff Pariser asserts claims as a member of the Class, ERISA Sub-Class and State Law Sub-Class for unpaid UCR amounts due him under these assigned claims. Plaintiff Pariser asserts claims as a member of the ERISA Sub-Class for unpaid UCR amounts due him in his capacity as insured ERISA plan participants' and beneficiaries' health care provider and also as the assignee of their benefit payment claims.

65. Plaintiff Pariser is and throughout the Class Period alleged herein has been a non-MD out-of-network health care provider to insureds covered by plans insured and/or administered by CareFirst, and remained and continues to remain free to charge his patients his actual charges for medical services rendered. During the Class Period, Plaintiff Pariser has had no direct contractual relationship with CareFirst. His experience with CareFirst is typical of other Class Members' experience during the Class Period.

66. Because he has been and continues to be a non-MD health care provider not in CareFirst's network of preferred providers, Plaintiff Pariser, as with other Class Members, typically has and continues to obtain claim assignments from his patients, through which CareFirst has and continues to pay him for providing health care to its insured or insured of a plan CareFirst administers. These claim assignments do not alter the legal relationship between CareFirst and its insured or insured of the plan it administers, but rather provide the convenience of allowing the insured to obtain needed health care on the implicit promise of later payment by CareFirst.

67. The assignment of benefits that Plaintiff Pariser and Class Members obtain from their CareFirst patients are security for future payment by CareFirst and direct CareFirst, as the patient's insurer or as the administrator of the patient's insurer, to pay the benefit claim direct to the out-of-network health care provider.

68. As with all other Class Members, Plaintiff Pariser was not told CareFirst's intended UCR reimbursement amount prior to the completion of his service. Indeed, as

with all other Class Members, CareFirst would not have disclosed its UCR reimbursement amount before completion of the service even if Plaintiff Pariser checked claim coverage and obtained pre-authorization from CareFirst before performing services for insureds of plans insured and/or administered by CareFirst. Payment was unknown and frequently not automatic – unlike the services CareFirst has obtained for its insureds or insureds of plans it administered.

69.     Plaintiff Pariser, like other Class Members, submitted and continues to submit his claims to CareFirst using standardized procedural codes such as CPT Codes, HCPCS (Healthcare Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a, CMS 1500). These claims are submitted to CareFirst either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching CareFirst. Plaintiff Pariser could submit larger claims to CareFirst on paper using the U.S. Mail.

70.     At all relevant times, Plaintiff Pariser expected to be reimbursed by CareFirst at the lesser of his billed charge or the current UCR rate.

71.     CareFirst unlawfully diminished Plaintiff Pariser's compensation by improperly calculating UCR rates and then misapplying these rates to his claims, as described herein. Plaintiff Pariser receives EOBs and Remittance Advices from CareFirst. Plaintiff Pariser's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense." However, nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Plaintiff Pariser does CareFirst discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. All Plaintiff Pariser sees, for example, is that when he bills CareFirst his usual $175.00 rate for his services, CareFirst did not pay him $175.00, but rather imposed an allowed amount $140.00 on the false premise that it represented the UCR amount and then paid him the percentage of the

UCR amount provided under the patient's plan. Plaintiff Pariser's patients are responsible for amounts owed to him in excess of CareFirst's allowed UCR reimbursement amount.

72.    With its methods for calculating UCR rates shrouded in a veil of secrecy, CareFirst has been able to derive improper rates using faulty data, and apply them to non-MD "out-of-network" provider claims in order to diminish lawful reimbursements to Plaintiff Pariser and the Class.

73.    CareFirst uses Ingenix data to understate the true market rates of medical care performed by non-MD "out-of-network" providers. The improper use of this data has caused both patients and Plaintiff and the Class to experience significant losses. Patients are harmed because payors like CareFirst are not reimbursing out-of-network services at appropriate levels, which results in patients increasingly being billed for amounts in excess of CareFirst's coverage. Plaintiff Pariser and the Class likewise are harmed because they are often unable to collect these balances from their patients and are forced to take a loss for their services. Moreover, because non-MD "out-of network" providers are often unaware of the scheme that results in CareFirst failing to pay appropriate UCR rates, they are either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

74.    Moreover, CareFirst's EOBs are intentionally uninformative, false, and misleading regarding the use of UCR rates. This ambiguity has resulted in the inconsistent application of UCR rates to deny the Class Members their lawful reimbursement.

75.    CareFirst has further diminished reimbursement by misapplying "in-network" policies to non-MD "out-of-network" provider claims. Indeed, CareFirst has at times improperly imposed multiple procedure reductions, which are only applicable to in-network providers, to deny and delay Class Members' lawful reimbursement. CareFirst's unlawful actions are deliberate and are intended to delay or diminish lawful reimbursement to non-MD "out-of-network" providers.

76.     With respect to the UCR reductions CareFirst imposed on Plaintiff Pariser, any exhaustion of administrative remedies with respect to the UCR determinations would be futile for several reasons, including: a) CareFirst, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix database or other faulty data it uses, b) other out-of-network non-MD providers have already submitted and completed claims thru CareFirst's administrative process seeking to increase their reimbursements based on CareFirst's faulty UCRs and CareFirst has denied each of those claims, and c) CareFirst, as described herein, presently uses and has expressed its intent to continue using Ingenix and other faulty data for UCR determinations.

77.     Alternatively, Plaintiff Pariser should be deemed to have exhausted any claims that otherwise were not exhausted, due to CareFirst's inadequate disclosure concerning grievance procedures and its violation of ERISA and the applicable ERISA regulations.

# VII.

## IRREPARABLE HARM AND ADDITIONAL HARSH CONSEQUENCES OF CAREFIRST'S CONTINUING USE OF INGENIX AND OTHER FAULTY DATA TO REIMBURSE PLAINTIFF AND THE CLASS

78.     CareFirst's application of faulty UCR rates has also damaged the health care provider-patient relationship.  As discussed above, CareFirst's conduct has forced non-MD "out-of-network" providers like Plaintiff Pariser to increasingly bill his patients for the balance of costs not covered by the insurer.  The ever-increasing expense of out-of-network treatments, as engineered by CareFirst, incentivizes patients, including Plaintiff Pariser's patients, to leave their regular providers in search of care from in-network providers.  CareFirst's conduct is solely intended to increase the health insurer's coffers, in relevant part, as follows:  by paying non-MD "out-of-network" providers at below market rates; by discouraging patients from seeking treatment from non-MD "out-of-network" providers through the improper deferral of healthcare costs to patients; and

by attempting to force non-MD "out-of-network" providers into contracting with

CareFirst and accepting discounted fee schedules. The foundation of quality healthcare

is the patient-provider relationship, which must be safeguarded. CareFirst's improper

conduct has damaged this fundamental relationship.

79. As noted above, the New York Attorney General aptly explained:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. **The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.**

January 13, 2009 New York Attorney General Health Care Report, "THE CONSUMER

REIMBURSEMENT SYSTEM IS CODE BLUE." (Emphasis added).

80. Moreover, CareFirst's conduct forces "out-of-network" providers like

Plaintiff and the Class to either accept a small fraction of their billed amount to settle

their bill or to bill their patients for the balance of costs not covered by the insurer.

Either way, the provider still looks like a charlatan to their patients and the trust built-up

between the provider and the patient that is a fundamental necessity for any provider-

patient relationship is irreparably harmed.

81. Indeed, one of the basic foundations of any successful treatment is

establishing a relationship of trust between the health care provider and the patient so

that the patient believes the provider is concerned with their well-being, the patient

opens up to the provider, and the patient gains confidence in the provider to guide and

treat them appropriately. By portraying the provider as a charlatan as CareFirst's

wrongful conduct has the effect of doing, Plaintiff's and the Class' patients are given

reason to believe that their they care more about the money than them and that if the

provider is cheating them by overcharging on their billing, their treatment and guidance may likewise be untrustworthy. The interference with the relationship of trust and the ever-increasing expense of out-of-network treatments, as engineered by CareFirst, incentivizes patients, including Plaintiff's and the Class' patients, to leave their regular providers in search of care from in-network providers.

82.    Patients who leave their out-of-network health care provider will spend months or years establishing a new relationship of trust with a new provider. The few patients who chose to stay with their out-of-network provider and pay higher than warranted out-of-pocket payments due to CareFirst's wrongful low reimbursements will have to try to repair their relationships to reestablish the trust they once had. In either event, the provider-patient relationship will be harmed and will prolong or slow the course of treatment and progress of patients, neither of which can be adequately compensated by damages or other legal relief, necessitating the injunctive and declaratory relief sought herein to enjoin CareFirst's continuing wrongful conduct.

83.    In addition to the foregoing practices, upon information and belief, CareFirst at times engages Plaintiff, the Class and other out-of-network providers in a series of pre-payment negotiations that are intended to unlawfully deny, diminish and delay lawful reimbursement. Rather than simply pay them the lesser of his billed charges or UCR, CareFirst (or a third-party hired by CareFirst) will make "offers" to Plaintiff, the Class and other out-of-network providers to pay adjusted prices below UCR amounts. Under the terms of these offers, acceptance of the adjusted price constitutes payment in full and prohibits Plaintiff, the Class and other out-of-network providers from billing the patient for the amount which exceeds the amount of his charges covered by CareFirst (except for deductible, coinsurance, and non-covered items, if any). The only incentive for Plaintiff, the Class and other out-of-network providers to accept these low-ball offers is to expedite the processing of the claim and payment (e.g. 10 days from receipt of the agreement). The alternative is to weather the storm, bill the patient, and hope that the matter is resolved. Resolution of these claims, however, can often take

months or even a year without any assurance that the appropriate amount will be paid. Upon information and belief, CareFirst uses these so-called pre-payment negotiations as a pretext to delay and diminish reimbursement to Plaintiff, the Class and other out-of-network providers.

84.    CareFirst's wrongful practices are intended to strong-arm "out-of-network" providers into agreeing to accept a lower rate than they rightfully deserve by holding on to already earned monies for prolonged periods under the pretext of pre-payment negotiation. CareFirst's hope is that "out-of-network" providers like Plaintiff Pariser and the Class will accept a highly discounted fee in exchange for "expedited" payment or give up and sign an agreement to participate in CareFirst's network at a rate which is more deeply discounted than would be the case were it not for CareFirst's unfair "out-of-network" providers payment policies. By continuing to be strong-armed to enter these agreements, Plaintiff, the Class and other out-of-network providers may be prevented from seeking damages or other legal relief in the future arising from those bills since CareFirst's conduct in under-reimbursing providers is now generally known.

## VIII.

## CLASS ALLEGATIONS

85.    Plaintiff brings this action on behalf of himself and all others similarly situated under Rule 23 of the Federal Rules of Procedure. The requirements of subparts 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met.

86.    Plaintiff brings this action on behalf of the following class:

> All out-of-network non-MD health care providers, who are not licensed medical doctors or doctors of osteopathy, practicing in the United States, and who, during the Class Period, submitted claims to CareFirst for payment of their health care services to insureds under an individual or group health care plan insured or administered by CareFirst, and were paid less than the amount submitted on their claims, hereinafter collectively referred to as the "Class" or "Class Members."

///

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

1    87.    Plaintiff also brings this action on behalf of an ERISA sub-class defined as

2  follows:

3          All out-of-network health care providers, who are not licensed
        medical doctors or doctors of osteopathy, practicing in the

4          United States, and who, during the Class Period, submitted
        claims to CareFirst for payment of their health care services to

5          insureds under a group health plan subject to ERISA that was
        insured or administered by CareFirst, and were paid less than

6          the amount submitted on their claims, hereinafter collectively
        referred to as the "ERISA Sub-Class" or "ERISA Sub-Class

7          Members."

8    88.    Plaintiff also brings this action on behalf of a state law sub-class for

9  California non-MD health care providers defined as follows:

10          All out-of-network health care providers, who are not licensed
        medical doctors or doctors of osteopathy, practicing in the

11          State of California, and who, during the Class Period,
        submitted claims to CareFirst for payment of their health care

12          services to insureds under an individual or group health plan
        not subject to ERISA that was insured or administered by

13          CareFirst, and were paid less than the amount submitted on
        their claims, hereinafter collectively referred to as the "State

14          Law Sub-Class" or "State Law Sub-Class Members."

15    89.    The non-MD health care providers that are part of the Class, ERISA Sub-

16  Class and State Law Class include chiropractors, podiatrists, physical therapists,

17  psychologists, optometrists, and other health care providers who are not licensed medical

18  doctors or doctors of osteopathy. The non-MD health care providers that are part of the

19  Class, ERISA Sub-Class and State Law Class also include non-MD providers that are

20  part of a non-MD practice group or non-MD organization, and does not include any

21  physician group or physician organization.

22    90.    The "Class Period" as used in this Complaint commences when CareFirst

23  began using faulty data to determine UCR rates for reimbursement payments to its

24  insureds' out-of-network non-MD health care providers as described throughout this

25  Complaint. Because Plaintiff believes this wrongful conduct by CareFirst is continuing,

26  the Class Period continues to run until CareFirst ceases the wrongful conduct described

27  herein or at such date as the Court determines the Class Period should end.

28

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

91.     Membership in the Class is so numerous that joinder of all members is impracticable. Although the number of Class Members and their names are presently unknown, this information can be readily determined from CareFirst's records. Upon information and belief, the Class and the ERISA Sub-Class includes Plaintiff and thousands of out-of-network providers nationwide. Upon information and belief, the State Law Sub-Class includes Plaintiff and thousands of out-of-network providers in the State of California. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied.

92.     There are numerous and substantial questions of law and fact common to all Class Members, ERISA Sub-Class Members and State Law Sub-Class Members that control this litigation and predominate over any individual issues. Common questions of law and fact include, but are not limited to:

- Whether CareFirst correctly calculated out-of-network UCR rates when it used Ingenix;

- Whether CareFirst's use of the Ingenix database to calculate out-of-network UCR reimbursement rates is unlawful;

- Whether CareFirst's failure to properly disclose its out-of-network pricing methodology in its EOBs, as well as its failure to disclose the numerous flaws in the Ingenix databases it used to calculate UCR rates is unlawful;

- Whether CareFirst engaged in racketeering;

- Whether CareFirst engaged in anti-competitive conduct;

- Whether Plaintiff and the Class have been damaged;

- The proper method for calculating the damages suffered by Plaintiff and the Class; and

- Whether Plaintiff and the members of the Class are entitled to declaratory, injunctive and/or other equitable relief.

93.     Plaintiff is a member of the Class, ERISA Sub-Class and State Law Sub-Class and will fairly and adequately protect the interests of the members of the Class, ERISA Sub-Class and State Law Sub-Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action, anti-trust, RICO and ERISA litigation and has no interests antagonistic to or in conflict with those of the Class, ERISA Sub-Class or State Law Sub-Class. For these reasons, Plaintiff is an adequate representative of the Class, ERISA Sub-Class and State Law Sub-Class.

94.     Plaintiff's claims are typical of the claims of Class Members, ERISA Sub-Class Members and State Law Sub-Class Members, and are based on and arise out of a uniform pattern or practice as described above. If litigated individually, the claims of each Class Member, ERISA Sub-Class Member and State Law Sub-Class Member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. CareFirst's actions are therefore generally applicable to the Class as a whole, and Plaintiff seeks equitable remedies with respect to the Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

95.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy since joinder of all members of the Class or the Sub-Classes is impracticable. Furthermore, the damages suffered by individual Class Members, ERISA Sub-Class Members and State Law Sub-Class Members may be relatively small in comparison with the expense and burden associated with individual litigation, which make it impossible for them to individually redress the harm done to them. Proceeding as a class action will permit an orderly and expeditious administration of the claims of Class Members, ERISA Class Members and State Law Class Members, will foster economies of time, effort and expense and will ensure uniformity of decision. Then, once CareFirst's liability is established, the Court and a jury can determine the claims of each member of the Class, ERISA Sub-Class and State Law Sub-Class. And, given the uniform policies and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## IX.

## LEGAL CLAIMS

## COUNT ONE

### (Violation of ERISA § 502(A)(1)(B))

96.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

97.     This claim is asserted by Plaintiff on his own behalf and on behalf of the ERISA Sub-Class Members.

98.     Plaintiff and the ERISA Sub-Class have standing to pursue these claims because they are the assignees of their patients' out-of-network CareFirst benefit claims.

99.     Plaintiff and the ERISA Sub-Class also have standing to pursue these claims because they are health care providers of insureds who are participants and beneficiaries in employer sponsored plans subject to ERISA that are insured or administered by CareFirst and as such are within the scope of persons ERISA was designed to protect when it provides a uniform scheme for enforcement of employee benefits.

100.    During the Class Period, CareFirst breached and continues to breach its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts in ERISA health care plans to Plaintiff and the ERISA Sub-Class in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

101.    CareFirst's breaches include, among other things, the misuse of the Ingenix database and other improper methods such as using Medicare data to calculate UCR amounts paid to out-of-network providers for health care services.

102.    Under the terms of its health plan, CareFirst administers benefits and is a fiduciary.

103.    In certain self-insured plans (a/k/a Administrative Services Only or "ASO"), CareFirst makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") concerning benefits.

104.   Where CareFirst acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, CareFirst is liable for underpaid benefits to Plaintiff and the ERISA Sub-Class in both fully insured and ASO ERISA health plans.

105.   Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff and the ERISA Sub-Class are entitled to recovery for unpaid benefits, and injunctive and declaratory relief relating to CareFirst's violation and continuing violation of the terms of its health care plans.

## COUNT TWO

### (Violations of RICO, 18 U.S.C. § 1962(c))

106.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

107.   This claim is asserted by Plaintiff on his own behalf and on behalf of the Class Members.

108.   Plaintiff and the Class have standing to pursue this claim as assignees of their patients' out-of-network CareFirst benefits and as third party beneficiaries of their patients' out-of-network CareFirst benefits.

109.   At all relevant times, CareFirst has been and continues to be a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

110.   At all relevant times, and as described in this Complaint, CareFirst carried out and continues to carry out its underpayment scheme to defraud Plaintiff and the Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of CareFirst and Ingenix (the "Enterprise").

111.   At all relevant times, the Enterprise has been and continues to be engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

112.   As described herein, the Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which CareFirst has engaged.  In addition, the members of the Enterprise

33

1  function as a structured and continuous unit, and performed roles consistent with this
2  structure. The members of the Enterprise performed certain legitimate and lawful
3  activities that are not being challenged in this Complaint, including the provision of
4  health insurance and plan and claims administration services by CareFirst, which was
5  done for many claims lawfully and without resort to unlawful practices. However, the
6  creation, use and dissemination of invalid data for use in making UCR determinations
7  was and is not lawful or legitimate. In addition to the legitimate activities carried out by
8  the members of the Enterprise, its members used and continues to use the Enterprise's
9  structure to carry out the fraudulent and unlawful activities alleged in this Complaint
10 including, but not limited to, the intentional underpayment of benefits to Plaintiff and the
11 Class resulting from CareFirst's use of flawed and invalid data for its UCR
12 determinations.

13     113.   The purpose of the Enterprise has been and continues to be to create a
14 means by which CareFirst could reduce payments to Plaintiff and the Class for out-of-
15 network services through the use of flawed and invalid data that could not easily be
16 challenged. The Enterprise created the Ingenix database which appeared to be a valid
17 database that reports actual charge data when, in fact, it was comprised of invalid and
18 flawed data. Through their roles in the Enterprise, Ingenix directly benefited and
19 continues to benefit from the licensing fees it earns from the sale of the Ingenix
20 databases and indirectly through the monies saved by UnitedHealthcare, its parent
21 corporation. CareFirst benefited by reducing the amount of benefits it paid to Plaintiff
22 and the Class for their out-of-network services through the use of the Ingenix database
23 for its UCR determinations.

24     114.   As alleged herein, although Ingenix issues a disclaimer to the users of the
25 Ingenix databases, CareFirst continues to use the Ingenix databases in a manner directly
26 at odds with the disclaimer. Ingenix knew that its data users were using the Ingenix
27 databases improperly to make UCR determinations but failed to stop it. At the same
28 time it was issuing a disclaimer in a misguided effort to attempt to provide itself (and

UnitedHealthcare) with legal protection, Ingenix also was promoting the Ingenix databases as a cost-saving mechanism for those insurers (such as CareFirst) who used and relied upon it in making UCR determinations. In fact, Ingenix provided extensive "litigation support" to its data users, including vouching for data used to price their UCR amounts. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, Ingenix ignored its own disclaimer, as did its users, despite the fact that the disclaimer correctly stated that the Ingenix database could **not** be used as a basis for making UCR determinations.

115. Ingenix and CareFirst knew that the UCR data was invalid because, *inter alia*, Ingenix only used the four basic data points discussed above to produce the final Ingenix database. Nonetheless, CareFirst continued to send the four data points to Ingenix and Ingenix continued to use the four data points to create the invalid Ingenix database which CareFirst used to under price UCR amounts.

116. Ingenix not only sought and accepted CareFirst's incomplete data, but it continued to provide a significant database discount to CareFirst. Ingenix also provided "litigation support" for UCR pricing determinations made by CareFirst using the Ingenix data. And, Ingenix failed to conduct any audits or reviews of the data it received from data contributors, including CareFirst. These actions were done in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the CareFirst-Ingenix Enterprise.

117. Defendants' submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including CareFirst.

118. Ingenix and CareFirst knew that the Ingenix databases were being used without Plaintiff or the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, CareFirst falsely reported to Plaintiff and Class Members, via U.S. mail and interstate wire communications, that its reductions in the amounts paid for out-of-network services were based on UCR amounts when, in fact, the

1  reductions were based on flawed and invalid numbers obtained from the Ingenix
2  databases that substantially underreported UCR amounts.

3  119.  During the Class Period, CareFirst participated and continues to participate
4  in the conduct of the Enterprise to shift the costs of medical treatment from CareFirst to
5  its insureds and therefore to Plaintiff and the Class, to reduce CareFirst's UCR payments
6  and to create an appearance of legitimacy for its out-of-network benefit reductions.
7  Using U.S. mail and interstate wire facilities, CareFirst provided false and misleading
8  information to Plaintiff and the Class to convert those withheld funds for the Enterprise's
9  own direct and indirect financial gain, and to discourage its insureds from using out-of-
10  network non-MD health care providers.  Because CareFirst saves money when services
11  are provided by in-network non-MD providers, the operations of the Enterprise saved
12  CareFirst money at the expense of non-MD providers like Plaintiff and the Class who
13  were out-of-network.  In turn, the Enterprise benefited from the pattern of racketeering
14  activity through the reduction of UCR costs by CareFirst and other users of the Ingenix
15  databases, which would not have been obtained without entry into the Enterprise and
16  was, in addition to the conduct of CareFirst alleged above, the shared goal of the
17  Enterprise for which its members functioned as a continuous unit.

18  120.  CareFirst, acting through its officers, agents, employees, and affiliates, has
19  committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §
20  1961(5), prior to and during the Class Period, and continues to commit such predicate
21  acts, in furtherance of its underpayment scheme for out-of-network services, including
22  (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of
23  18 U.S.C. § 1343.  Such predicate acts include the following:

24  a.  mailing, causing to be mailed and/or knowingly agreeing to the
25  mailing of various materials and information including, but not
26  limited to, letters regarding preauthorization approval(s) and/or
27  appeals and materially false and misleading UCR determinations,
28  EOBs and remittance advices for the purpose of saving CareFirst

1    money at the expense of Plaintiff and the Class, with each such

2    mailing constituting a separate and distinct violation of 18 U.S.C. §

3    1341; and

4    b.    transmitting, causing to be transmitted and/or knowingly agreeing to

5    the transmittal of various materials and information including, but not

6    limited to, preauthorization approvals; materially false UCR

7    determinations and related explanation of such determinations, by

8    means of telephone, facsimile and the Internet, in interstate

9    commerce, for the purpose of effectuating the above-described false

10    payment schemes, and each such transmission constituting a separate

11    and distinct violation of 18 U.S.C. § 1343.

12    121.    In furtherance of its scheme to reduce out-of-network provider benefits

13    below the level it was otherwise contractually required to pay, using the U.S. mail and/or

14    interstate wire facilities, CareFirst also submitted fraudulent certifications to Ingenix

15    concerning its data. CareFirst falsely attested to the accuracy of the data it submitted to

16    Ingenix's databases despite the fact that it maintained internal policies prohibiting

17    substantial data from being included in its submission to Ingenix.  The impact of

18    CareFirst's data manipulation was to lower the amount of the reported charges so as to

19    reduce the ultimate numbers that Ingenix would report and which CareFirst would use

20    for making its UCR determinations.  This information was material and was withheld by

21    CareFirst from Plaintiff and the Class.

22    122.    CareFirst used the U.S. mail to send EOBs to Plaintiff and the Class that

23    showed UCR benefit reductions but did not sufficiently disclose the basis for CareFirst's

24    exclusion or reduction of charges, which prevented Plaintiff and the Class from learning

25    the information needed to challenge or successfully appeal CareFirst's UCR amount

26    determinations. CareFirst concealed the identity of the database, type of data or other

27    methodology upon which it relied in determining UCR amounts. CareFirst also failed to

28    provide other information required under ERISA.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

123.   CareFirst also used the U.S. mail to send Plaintiff and the Class intentionally incomplete and misleading correspondence denying or reducing their claims and appeals, which again failed to identify the Ingenix databases as the basis for those denials.

124.   CareFirst directs (on its EOBs) insureds and providers to call its toll free telephone number if they have questions about the claim at issue.  CareFirst also maintains a public website wherein it fraudulently and misleadingly represented to CareFirst's insureds and providers that it made UCR determinations based on the prevailing charges of what other providers charged for similar services.  CareFirst's website further misrepresented that CareFirst would consider factors that it, in fact, does not consider, such as the provider's specialty and, that it will consider the prevailing charges in other areas if only a small number of charges or providers submitting charges have been submitted in that particular geographic area.  These statements, as disseminated to Plaintiff and the Class on CareFirst's Internet website (which uses interstate wire facilities), were false.

125.   As demonstrated by the foregoing allegations, CareFirst, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiff and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiff and the Class.

126.   CareFirst's representations were knowingly false and misleading.  CareFirst knew and recklessly disregarded that its methodology for establishing out-of-network UCR amounts, which was to rely primarily on Ingenix's databases, was inherently flawed; that Ingenix's databases were incapable of accurately calculating UCR levels; and that CareFirst did not  have a valid basis upon which to represent that the bills submitted out-of-network non-MD health care providers' were "greater than the reasonable and customary charge" or the "prevailing charge level" for the relevant services in a particular geographic area.

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

127. Despite its mutual knowledge that the Ingenix data did not accurately determine UCR amounts, CareFirst both defended the Ingenix data when questioned about UCR determinations based on it and by agreement relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data. Ingenix promised to supply witnesses in court if CareFirst's use of Ingenix data were challenged. In the course of appeals and other questions from CareFirst's insureds, Ingenix provided graphs and other details, vouching for the accuracy and legitimacy of its data. CareFirst then used the detail from Ingenix to vouch for the Ingenix data to the CareFirst insured or provider who was questioning UCR amounts.

128. The foregoing communications, sent via U.S. mail and interstate wire facilities, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR amount determinations, and/or otherwise were incident to an essential part of CareFirst's scheme to defraud Plaintiff and the Class described in this Complaint. Further, CareFirst used these written communications to provide an appearance of legitimacy and regularity, and/or to postpone ultimate discovery and complaint of its underpayment scheme for out-of-network services, thereby making their discovery less likely than if such mailings or wire transmission had not taken place.

129. As named fiduciaries and claims administrators of various of the CareFirst plans, CareFirst occupied and occupies a position of trust and it had, and has, a special relationship with its insureds, and therefore with Plaintiff and the Class, that requires it to accurately represent the terms and conditions of its health plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

130. Each use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

131. The above-described acts of mail and wire fraud are related because they each involve common members, common out-of-network claim practices, common

1  results impacting upon common victims, and are continuous because they occurred over
2  several years, and constitute the usual practice of CareFirst and the Enterprise, such that
3  they amount to and pose a threat of continued racketeering activity.

4      132.    If CareFirst had not participated in the conduct of the Enterprise, CareFirst
5  could not have saved the millions of dollars it did by using the Ingenix databases for
6  making UCR determinations even though it knew that they were flawed and invalid.  By
7  using the Ingenix database for making its UCR determinations, misrepresenting them,
8  through use of the U.S. mail and interstate wire facilities, as providing a valid and
9  unassailable basis for such decisions, and deterring its insureds from challenging or
10  otherwise raising questions over how it set UCR amounts, CareFirst was and continues
11  to be able to benefit substantially from its role in assisting the control and direction  of
12  the Enterprise, along with Ingenix and UnitedHealthcare.

13      133.    CareFirst issued and continues to issue and transmit by mail or wire false
14  and misleading letters to providers regarding benefits, as well as false and misleading
15  EOBs and Explanations of Payment.  CareFirst made and still makes out-of-network
16  benefit reductions that were contrary to the law.  CareFirst knew that the data it
17  contributed to Ingenix was inadequate and lacked required data fields essential for
18  Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but
19  CareFirst continued and continues to use the Ingenix databases to make UCR
20  determinations anyway.

21      134.    In furtherance of its underpayment scheme for out-of-network services,
22  CareFirst, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and
23  regularly used and uses the U.S. mail and interstate wire facilities to further all aspects of
24  the intentional underpayment to Plaintiff and the Class by delivering and/or receiving
25  materials necessary to carry out the scheme to defraud Plaintiff and the Class.

26      135.    The direct and intended victims of the pattern of racketeering activity
27  described herein are Plaintiff and the Class, whom CareFirst has underpaid and continues
28  to underpay for out-of-network services.

136.   Plaintiff and the Class were and continue to be injured by reason of CareFirst's RICO violations because they were underpaid for services rendered to insureds of plans insured and/or administered by CareFirst and were and are forced to exhaust significant time and resources addressing CareFirst's wrongful practices. CareFirst further deprived Plaintiff and the Class of the knowledge necessary to adequately challenge the underpayments.  Their injuries have been and continue to be proximately caused by CareFirst's violations of 18 U.S.C. § 1962(c) because they have been and continue to be the foreseeable, direct, intended and natural consequences of CareFirst's RICO violations (and commission of underlying predicate acts) and, but for CareFirst's RICO violations (and commission of underlying predicate acts), Plaintiff and the Class would not have suffered and will not continue to suffer these injuries.

137.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to recover threefold their damages, injunctive and declaratory relief to enjoin CareFirst's continuing wrongful conduct described in this Complaint, plus costs and attorneys' fees from CareFirst and other appropriate relief.

## COUNT THREE

### (Breach of Fiduciary Duties of Loyalty & Due Care In Violation of ERISA § 404)

138.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

139.   This claim is asserted by Plaintiff on his own behalf and on behalf of the ERISA Sub-Class members.

140.   Plaintiff and the ERISA Sub-Class have standing to pursue these claims because they are the assignees of their patients' out-of-network benefits claims to CareFirst.

141.   Plaintiff and the ERISA Sub-Class also have standing to pursue these claims because they are health care providers of insureds who are participants and beneficiaries in employer sponsored plans subject to ERISA that are insured or administered by CareFirst and as such are within the scope of persons ERISA was

41

designed to protect when it provides a uniform scheme for enforcement of employee benefits.

142.    Pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, CareFirst acted and continues to act as a fiduciary of its insureds' health plans, as well as a fiduciary for self-insured plans, by *inter alia*, deciding final appeals.

143.    In its role as a fiduciary, CareFirst owes Plaintiff and the Class a duty of care that requires it to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  In this role, CareFirst must also ensure that it complies with the documents and instruments governing its plan(s), in accordance with § 404(a)(1)(B) and (D) of ERISA, 29 U.S.C.A § 1104(a)(1)(B) and (D).  CareFirst failed to do so, and has violated its fiduciary duty of care to its insureds.

144.    As a fiduciary of health plans under ERISA, CareFirst also had a duty of loyalty to Plaintiff and the Class, which required it to make decisions in the interest of its insureds, not itself, and to avoid self-dealing or financial arrangements that would benefit CareFirst at the expense of its insureds, in accordance with § 406 of ERISA, 29 U.S.C. § 1106.  CareFirst therefore could not make health care benefit decisions to save money at the expense of its insureds.

145.    Nevertheless, CareFirst violated its fiduciary duty of loyalty by, *inter alia*, using the Ingenix database, during the Class Period, to benefit itself at the expense of insureds and in a manner contrary to its contractual obligations.  CareFirst further violated this duty by not disclosing material information to insureds, such as, *inter alia*, that it was determining UCR rates using the flawed Ingenix databases.  As the largest data contributor to Ingenix databases, CareFirst knew many of the flaws, outlined above, that made that data improper for establishing UCR amounts.

146.    CareFirst used the U.S. mail and interstate wire, during the Class Period, to make representations, *inter alia*, about Ingenix's databases that it knew were false.

1    147.   CareFirst and not the plans have the information necessary to provide

2  equitable and other relief in this action.  Under ERISA, CareFirst was the common

3  administrator of all of these plans.  CareFirst failed to administer these plans and pay

4  benefits pursuant to the terms of the plans' requirements that benefits for out-of-network

5  providers be calculated on the basis of a true and accurate UCR.  Indeed, by allowing,

6  countenancing and enabling the calculation of benefits to be based on something other

7  than the true and accurate UCR required by the plans, CareFirst made lower benefit

8  payments to Plaintiff and the Class than required by the plans.  Plaintiff believes that

9  relief for the wrongdoing alleged may only be remedied by an order enjoining

10  CareFirst's continuing misconduct and requiring CareFirst to recalculate the benefits

11  owed to Plaintiff and the Class.

12    148.   Plaintiff and the Class may assert a claim for relief for CareFirst's violation

13  of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including

14  injunctive and declaratory relief, and may seek removal of any fiduciary that breached its

15  duties.

16                              **COUNT FOUR**

17                      **(Violations of § 664 of RICO)**

18    149.   Plaintiff hereby incorporates by reference each of the preceding paragraphs

19  as though fully set forth herein.

20    150.   This claim is asserted by Plaintiff on his own behalf and on behalf of the

21  members of the ERISA Sub-Class described above.

22    151.   Plaintiff and the ERISA Sub-Class have standing to pursue these claims as

23  assignees of their patients' out-of-network benefits and as third party beneficiaries of

24  their patients' out-of-network benefits.

25    152.   Plaintiff and the ERISA Sub-Class also have standing to pursue these

26  claims because they are health care providers of insureds who are participants and

27  beneficiaries in employer sponsored plans subject to ERISA that are insured or

28  administered by CareFirst and as such are within the scope of persons ERISA was

designed to protect when it provides a uniform scheme for enforcement of employee benefits.

153.   Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)." 18 U.S.C. § 1961(1)(B).  Section 664 of Title 18 provides:

**Theft or embezzlement from employee benefit plan**

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

154.   Each of the CareFirst health care plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

155.   Each of the CareFirst health care plans that is subject to ERISA or is a non-ERISA plan funded by insurance coverage CareFirst provides or administers, is subject to Section 664 of Title 18.  The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

156.   The governing plan documents warrant that all benefits due under the plan will be paid.  By improperly reducing payments on out-of-network claims, CareFirst intentionally caused and continues to cause Plaintiff and the members of the ERISA Sub-Class to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of CareFirst's group health plan.

157.   For fully insured health care plans, in which CareFirst both administered the plans and paid the benefits from its own assets, CareFirst benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by CareFirst in its fiduciary capacity under ERISA and non-ERISA plans and paid to its insureds, CareFirst improperly withheld such funds and maintained them as part of its

own assets for CareFirst's own benefit. For self-funded health care plans, CareFirst made final appeal decisions and intentionally caused underpayment of benefits to Plaintiff and the ERISA Sub-Class in order to justify its receipt of administrative fees.  Ingenix benefited indirectly through the saving generated by its parent, UnitedHealthcare, and directly through the licensing fees it received from CareFirst and other insurers who used the flawed Ingenix databases to commit RICO violations.

158.  CareFirst and its co-conspirators acted with specific intent to deprive Plaintiff and ERISA Sub-Class Members of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by Plaintiff, ERISA Sub-Class Members and the insureds whose plans they were administering.

159.  Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended insured, for CareFirst's direct or indirect benefit.

160.  As set forth above, CareFirst engaged and continues to engage in multiple and multi-faceted schemes, including use of the Ingenix database, to make improperly reduced payments for out-of-network services.

161.  In furtherance of its false payment schemes, CareFirst, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used and continues to use the U.S. mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, UCR determinations, appeal determinations, overpayment actions, pre-authorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the Ingenix databases.

162.  The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise

were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaints of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of CareFirst's out-of-network pricing methods.

163.    As named fiduciaries and claims administrators of various of the CareFirst health care plans, CareFirst occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiff and ERISA Sub-Class Members that requires it to accurately represent the terms and conditions of the CareFirst health care plans, and to disclose all facts the omissions of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

164.    Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

165.    The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of CareFirst such that they amount to and pose a threat of continued racketeering activity.

166.    The purpose of CareFirst's false payment scheme was to underpay the guaranteed benefits that were assigned to Plaintiff and ERISA Sub-Class Members, and convert those withheld funds for its own direct or indirect financial gain. CareFirst created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiff and ERISA Sub-Class Members to increase revenue through its plan and claims administration business.

167.    The direct and intended victims of this pattern of racketeering activity are Plaintiff and ERISA Sub-Class Members, who CareFirst deprived and continues to

deprive of the complete guaranteed benefits to which they were entitled for their out-of-network services.

168.    CareFirst and its co-conspirators' RICO violations injured and continues to injure Plaintiff and ERISA Sub-Class Members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations.  Plaintiff's and the ERISA Sub-Class' injuries were proximately caused by CareFirst's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and the natural consequence of CareFirst's RICO violations (and commission of underlying predicate acts), and but for CareFirst and its co-conspirators' RICO violations (and commission of underlying predicate acts), Plaintiff and ERISA Sub-Class Members would not have suffered and will not continue to suffer the injuries they have and continue to incur.

169.    As a result of its misconduct, CareFirst is liable to Plaintiff and the ERISA Sub-Class in an amount to be determined at trial.  Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and ERISA Sub-Class Members are entitled to recover threefold their damages, injunctive and declaratory relief to enjoin CareFirst's continuing wrongful conduct described in this Complaint, as well as costs and attorneys' fees from CareFirst and any other appropriate relief.

## COUNT FIVE

### (Violations of The Sherman Act § 1 (15 U.S.C. § 1))

170.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

171.    This claim is asserted by Plaintiff on his own behalf and on behalf of the Class Members.

172.    Plaintiff and the Class have standing to pursue these claims because they are the assignees of their patients' out-of-network CareFirst benefits claims.

/ / /

173.   CareFirst participates in, and affects, interstate commerce. CareFirst's activities, including the administration and operation of health plans and managed care plans, in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce. CareFirst's unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices, described herein, substantially affect and restrain the operation of interstate commerce.

174.   CareFirst, Ingenix and other unnamed co-conspirators, including but not limited to United HealthCare, Aetna and Cigna, unlawfully restrain competition by, *inter alia*, fixing the price of UCR rates for out-of-network services well below the level that would exist in a truly competitive market; agreeing to universally set the UCR amount based upon Ingenix's faulty databases; and pressuring out-of-network non-MD providers to join their networks by uniformly failing to pay competitive market rates for out-of-network services.

175.   CareFirst and Ingenix have combined, conspired and/or agreed with one another, and/or with unnamed co-conspirators, to unreasonably restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. CareFirst combined, conspired and/or agreed with its co-conspirators to artificially lower, fix or maintain the UCR amounts it paid to Plaintiff and the Class, which constitutes a horizontal price fixing conspiracy that is a *per se* violation of the Sherman Act.

176.   More specifically, CareFirst reached agreement with its competitors, including UnitedHealthcare, CareFirst and/or a number of other non-parties to determine the UCR using primarily the Ingenix Database, as described above.

177.   UnitedHealthcare acts through its alter ego Ingenix to facilitate the direct horizontal agreements for compiling and sharing competitive information and UCR rate data among all the conspirators, including CareFirst.

/ / /

/ / /

178.  CareFirst and other data contributors to Ingenix are entitled to "free" use of the Ingenix databases simply for continuing to submit data at the level which they submitted data when the database was owned by HIAA.

179.  CareFirst engaged in price fixing when it agreed with its competitors, including UnitedHealthcare, to utilize the same database to determine the UCR rates for health care services, which lead to them paying substantially the same reduced rates for services rendered to their insured.

180.  Typical examples of price fixing agreements include those that adopt a standard formula for computing prices and/or adhere to a minimum fee or price schedule.  CareFirst did both.

181.  CareFirst along with its co-conspirators adopted a standard formula for making UCR determinations, and each has agreed to a method of determining the maximum price or fee, via the Ingenix database, that it will pay for out-of-network charges.  This alone amounts to a naked agreement to fix prices.

182.  CareFirst's agreement gives it, collectively with its competitors, tremendous market power to set UCR at rates well below those which would exist in a competitive marketplace.  In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively to reduce prices.  Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, CareFirst would be unable to systematically and across the board reduce the UCR rates paid.

183.  In addition to agreeing to price their UCR rates using the exact same databases, the insurers also engage in exactly parallel behavior.  They have substantially similar contracts with their customers; they submit UCR rate data to the databases that they know skew the relevant UCR determinations downward; and they all utilize Ingenix databases to determine UCR rates.  These parallel behaviors allow their price fixing agreement to effectively depress the UCR rate paid to providers for services rendered to their insureds, and otherwise reduce competition among would-be-competitors.

184. The market is ripe for collusion, conspiracy and agreement as it is heavily concentrated, with a relatively standardized product, with numerous opportunities for the CareFirst and its co-conspirators to agree and collude, including involvement and participation in the same trade associations, and availability of the same Ingenix Databases. Additionally, because pricing information is shared among the parties, defection from the agreement is easy to detect.

185. There is virtually no incentive for CareFirst, or its co-conspirators, to compete in setting the out-of-network UCR rate. To the contrary, each conspirator benefits from reduced UCR reimbursement costs made possible by their agreement without affecting their ability to compete for customers.

186. In fact, the agreement to use the Ingenix databases for UCR determinations allow all co-conspirators to enjoy the monopoly or near monopoly status that CareFirst and some of its co-conspirators experience in certain markets due to the use of data skewed by use of the in-network negotiated charge data used in those area.

187. CareFirst and its co-conspirators further benefit from their agreement to fix and suppress prices because the depressed UCR rates incentivizes providers to become members of their various "networks," where further cost reducing measures and other methods of control can be placed on them.

188. A market with the characteristics described above facilitates collusion and agreement to fix prices, and detection and discipline are also easy to maintain.

189. CareFirst's agreement with its competitors to use the Ingenix databases to determine UCR amounts enabled CareFirst to impose artificially low UCR rates and other anticompetitive restrictions on Plaintiff and the Class that could not exist in a competitive market.

190. Competition between the payors also has been reduced by the agreement to improperly reduce UCR amounts.

/ / /

/ / /

191. Without the agreement to fix UCR rates and reduce competition among payors, Plaintiff and the Class would be paid more for the health care services they rendered to insureds of CareFirst and CareFirst administered plans.

192. Nearly every major health insurer uses Ingenix's databases, making it nearly impossible for providers not to be affected by CareFirst's and its co-conspirators' agreement to use the Ingenix data to fix prices and not complete. As a result, CareFirst and its co-conspirators are able to control the market in a way that reduces their costs at the expense of out-of-network non-MD health care providers to whom they pay only a fraction of what they are owed or the market demands. Because of this "price fixing" scheme, CareFirst has paid less money to Plaintiff and the Class for their out-of-network services than they should have in a competitive market absent such a scheme.

193. CareFirst's activities, including the administration and operation of health care plans in every state in the United States, are in a regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce as specified herein.

194. CareFirst's unlawful activities, concerted action, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce as specified herein.

195. Out-of-network health care services are the relevant product and/or services market affected by CareFirst's conduct.

196. The United States of America is the relevant geographic market.

197. As a result of the foregoing agreement or conspiracy, CareFirst has caused Plaintiff and the Class to suffer financial loss due to the fact that CareFirst pays them UCR rates that are unconscionably low and at noncompetitive levels.

198. Plaintiff and the Class are out-of-network health care providers, are a target of CareFirst and its co-conspirators scheme to fix lower UCR reimbursement rates for out-of-network providers, and are most appropriate persons to compensate for their losses as a result of this price-fixing scheme since compensating them the appropriate

UCR amount for their services will increase their reimbursements for their services to insureds and will therefore reduce the out-of-pocket obligation of the insureds who are the other target of CareFirst's and its co-conspirators' price-fixing scheme.

199. Plaintiff and the Class are entitled to damages under 15 U.S.C. § 15, *et seq.*, in an amount to be determined at trial, trebled, plus their costs, expenses and attorneys' fees. Plaintiff and the Class further seek injunctive and declaratory relief in the form of order prohibiting CareFirst from engaging in the unlawful behavior described herein, and any other appropriate relief.

## COUNT SIX

### (Violations California Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* )

200. Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

201. This claim is asserted by Plaintiff on his own behalf and on behalf of the State Law Sub-Class Members.

202. Plaintiff has standing to bring this claim since he is a out-of-network health care provider as to CareFirst, practices as a psychologist in California, has treated and submitted claims to CareFirst for services to patients in California who are insureds under individual or group health care plans not subject to ERISA that are insured or administered by CareFirst, and has justifiably relied on CareFirst's unlawful, unfair and fraudulent acts and practices described herein to his detriment by receiving lower reimbursements from CareFirst than he should have as a result of CareFirst's wrongful acts and practices as detailed throughout this Complaint.

203. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code §17200.

204. A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal laws or regulations.

205. California Health & Safety Regs., title 28, Sect. 1300.71, subd. (a)(3)(B) provides:

**(3) "Reimbursement of a Claim" means:**

(B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration:(i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

206. As described throughout this Complaint, CareFirst's use of Ingenix and other faulty data to determine UCR rates for reimbursements to Plaintiff and the State Law Sub-Class was not based on statistically credible information as required by the California regulation quoted above. Rather, it was based on unreliable data that skewed UCR rates and reimbursements to Plaintiff and the State Law Sub-Class to lower amounts than they should have been. CareFirst's conduct violated the "unlawful" prong of the Unfair Competition Law.

207. CareFirst's conduct also violated the "unlawful" prong of the Unfair Competition Law by violating its duty of disclosure under Section 332 of the California Insurance Code to Plaintiff and the State Law Sub-Class as assignees of insureds under their health insurance plans. Section 332 entitled "Required Disclosure" provides that: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." As described throughout this Complaint, CareFirst concealed, misrepresented and failed to disclose to Plaintiff and the State Law Sub-Class its use of faulty and unreliable data to determine UCR amounts or that it was under-reimbursing them, which was material information known only to CareFirst and its co-conspirators.

208. Additionally, as the violation of any law may serve as the predicate for a violation of the "unlawful" prong of the Unfair Competition Law, Plaintiff further

1  alleges that CareFirst, in violating RICO, the Sherman Act, and the common law of
2  contract, violated the Unfair Competition Law.

3  209.  A business act or practice is "unfair" under the Unfair Competition Law if
4  the reasons, justifications and motives of the alleged wrongdoer are outweighed by the
5  gravity of the harm to the alleged victims.

6  210.  CareFirst violated, and continues to violate, the "unfair" prong of the UCL
7  in the following ways:

8      a.  Using faulty and unreliable data to determine UCR amounts that
9      result in underpayments to Plaintiff and the State Law Sub-Class as
10     described throughout this Complaint;

11     b.  Concealing from Plaintiff and the State Law Sub-Class through
12     various misrepresentations and non-disclosures as described
13     throughout this Complaint its use of faulty and unreliable data to
14     determine UCR amounts or that it was underpaying Plaintiff and the
15     State Law Class;

16     c.  Failing to comply with its obligations under its insuring agreements
17     and applicable law as described throughout this Complaint to use
18     statistically reliable data to determine UCR amounts for
19     reimbursements paid to out-of-network providers such as Plaintiff
20     and the State Law Sub-Class; and

21     d.  Underpaying Plaintiff and the State Law Sub-Class for their services
22     as described throughout this Complaint.

23 211.  A business act or practice is "fraudulent" under the Unfair Competition Law
24 if it actually deceives or is likely to deceive members of the consuming public.

25 212.  CareFirst's acts and practices as described herein have deceived and/or are
26 likely to deceive members of the consuming public, including Plaintiff and the State Law
27 Sub-Class.

28

213.   The gravity of the harm to members of Plaintiff and the State Law Sub-Class resulting from such unlawful, unfair and fraudulent acts and practices outweighs any conceivable reasons, justifications and/or motives of CareFirst for engaging in such deceptive acts and practices.  By committing the acts and practices alleged above, CareFirst has engaged, and continue to be engaged, in unlawful, unfair and fraudulent business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

214.   Through its unlawful, unfair and fraudulent acts and practices described herein, CareFirst has obtained, and continues to unlawfully, unfairly and fraudulently obtain, money from Plaintiff and members of the State Law Sub-Class by its under-reimbursements for their services.  CareFirst has been, and will continue to be, unjustly enriched at the expense of Plaintiff and members of the State law Sub-Class by its wrongful conduct.  As such, Plaintiff requests that this Court cause CareFirst to restore this money to Plaintiff and all Class members, and to enjoin CareFirst from continuing to violate the Unfair Competition Law as discussed herein.  Otherwise, Plaintiff and the State Law Sub-Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT SEVEN**

**(Breach of Contract)**

215.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

216.   This claim is asserted by Plaintiff on his own behalf and on behalf of the State Law Sub-Class Members.

217.   Plaintiff and the State Law Sub-Class have standing to pursue this claim as assignees of their patients' out-of-network CareFirst benefits and as third party beneficiaries of their patients' out-of-network CareFirst benefits on individual or group health insurance plans not subject to ERISA that are insured or administered by CareFirst.

218.   Under the individual and group health insurance plans of Plaintiff's and the State law Sub-Class' patients, CareFirst agreed to and therefore is required to make credible and reliable UCR determinations for reimbursement claims made for service by out-of-network providers and to make appropriate reimbursement payments in accordance with the terms of those plans.

219.   As described throughout this Complaint, CareFirst breached its contractual obligations to make credible and reliable UCR determinations and to make appropriate reimbursement payments for out-of-network providers' services.

220.   As a result of CareFirst's contractual breaches, reimbursement payments for out-of-network providers services were less than they should have been, causing economic losses to Plaintiff and the State Law Sub-Class as assignees or third-party beneficiaries of their patients out-of-network CareFirst benefits.

## COUNT EIGHT

### (Constructive Fraud)

221.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

222.   This claim is asserted by Plaintiff on his own behalf and on behalf of the State Law Sub-Class Members.

223.   As described throughout this Complaint, CareFirst had a legal duty to make reliable and credible UCR determinations for reimbursement claims for out-of-network provider services performed by Plaintiff and the State Law Sub-Class, and had a legal duty to disclose and not conceal or misrepresent to Plaintiff and the State Law Sub-Class the basis of its UCR determinations and reimbursement payments and other wrongful conduct described herein.

224.   CareFirst violated the legal duties it owed to Plaintiff and the State law Sub-Class by making UCR determinations and reimbursements to them based on faulty data, and by misrepresenting, concealing and otherwise failing to disclose its wrongful conduct to Plaintiff and the State Law Sub-Class.

225. CareFirst violated the legal duties it owed to Plaintiff and the State Law Sub-Class willfully, wantonly and with reckless disregard.

226. As a direct and proximate result of CareFirst's violations of its legal duties owed to Plaintiff and the State Law Sub-Class described herein, Plaintiff and the Sub-Class have and continue to suffer monetary losses and other harm described herein.

# X.

## PRAYER AND RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against CareFirst and in their favor as follows:

A. Certifying the Class as set forth in this Complaint, and appointing Plaintiff as Class representative for these classes and appointing his counsel as attorneys for the Class;

B. Declaring that CareFirst has breached the terms of its members' plan with regard to out-of-network benefits in its members' health plans, and thereby awarding benefits to Plaintiff and the ERISA Sub-Class for unpaid benefits in ERISA plans, as well as awarding declaratory relief with respect to CareFirst's violations of ERISA, plus costs, expenses and attorneys' fees;

C. Declaring that under ERISA CareFirst has failed to administer claims in accordance with the governing plan documents with respect to the calculation of amounts owed to out-of-network providers, requiring CareFirst to recalculate the benefits owed in accordance with the plans' terms, awarding additional benefits to Plaintiff and the ERISA Sub-Class, plus costs, expenses and attorneys' fees;

D. Declaring that CareFirst is liable to Plaintiff and the Class pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 15 in an amount to be determined at trial, trebled plus their costs, expenses and attorneys' fees;

E. Declaring that CareFirst is liable to Plaintiff and the Class pursuant to RICO, 18 U.S.C. §§ 1962(a) and (c), 1964(c) for threefold their damages, costs and

1  attorney fees;

2      F.      Enjoining CareFirst from committing the Sherman Act and RICO violations

3  described above in the future and/or declaring their invalidity;

4      G.      Preliminarily and permanently enjoining CareFirst from using the Ingenix

5  databases, or from making UCR determinations in the absence of valid and reliable data

6  substantiating the lesser-adjudicated claims amounts;

7      H.      Preliminarily and permanently enjoining CareFirst from using or causing

8  others to use outdated Ingenix data in connection with payment of out-of-network

9  benefit claims by CareFirst members.

10     I.      Preliminarily and permanently enjoining CareFirst from applying out-of-

11 network adverse benefit determinations where Evidences of Coverage and group health

12 plan summary documents do not disclose or authorize them;

13     J.      Preliminarily and permanently enjoining CareFirst from discouraging

14 appeals and/or deciding appeals in a manner inconsistent with applicable law;

15     K.      Preliminarily and permanently enjoining CareFirst from discouraging out-

16 of-network care or placing undisclosed obstacles in the path of CareFirst members

17 seeking to access out-of-network care;

18     L.      Awarding Plaintiff and the Class the costs and disbursements of this action,

19 including reasonable counsel fees, costs and expenses in amounts to be determined by

20 the Court;

21     M.      Awarding interest from date of initial out-of-network adverse benefit

22 determinations on all unpaid amounts;

23     N.      Awarding prejudgment interest;

24     O.      Awarding punitive damages to Plaintiff and the State Law Sub-Class on the

25 Counts for which they are available; and

26     P.      Granting such other and further relief as is just and proper.

27 / / /

28 / / /

# XI.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial for all claims so triable.

DATED:  July 27, 2009

Respectfully Submitted,

**BRAUN LAW GROUP, P.C.**

By: _____

Michael D. Braun, Esq.
10680 W. Pico Boulevard, Suite 280
Los Angeles, CA 90064
Phone:   (310) 836-6000
Fax:       (310) 836-6010

Janet Lindner Spielberg
**LAW OFFICE OF JANET LINDNER
SPIELBERG**
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Phone:   (310) 392-8801
Fax:       (310) 278-5938

Joseph N. Kravec, Jr., Esq.
**SPECTER SPECTER EVANS
& MANOGUE, P.C.**
436 Seventh Avenue
Pittsburgh, PA 15219
Phone:   (412) 642-2300
Fax:       (412) 642-2309

Ellen M. Doyle, Esq. (*Pro Hac Vice
Application Pending*)
Email:  edoyle@stemberfeinstein.com
William T. Payne, Esq. (Bar No. 90988)
Email:  wpayne@stemberfeinstein.com
**STEMBER FEINSTEIN DOYLE
& PAYNE, LLC**
429 Forbes Avenue, 17th Floor
Pittsburgh, PA 15219
Phone:   (412) 281-8400
Fax:       (412) 281-1007

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV09- 5467 CBM (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Michael D. Braun (Bar No. 167416)
BRAUN LAW GROUP, P.C.
10680 W. Pico Blvd., Suite 280
Los Angeles, CA 90064
Phone: (310) 836-6000; Fax: (310) 836-6010
E-Mail: service@braunlawgroup.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PARISER, a California citizen, on behalf of himself and all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>CAREFIRST OF MARYLAND, INC., a Maryland corporation, and GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., a District of Columbia corporation, collectively doing business as CAREFIRST BLUECROSS BLUESHIELD,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV09-5467 CBM (CWx)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Michael D. Braun, Esq._____, whose address is _Braun Law Group, P.C., 10680 W. Pico Blvd., Suite 280, Los Angeles, CA 90064_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.


Clerk, U.S. District Court

Dated: _____JUL 2 7 2009_____     By: _____**NATALIE LONGORIA**_____

Deputy Clerk

(Seal of the Court)

1198

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)]._

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>MICHAEL PARISER, a California citizen, on behalf of himself and all others similarly situated, | **DEFENDANTS**<br>CAREFIRST OF MARYLAND, INC., a Maryland corporation, and GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., a District of Columbia corporation, collectively doing business as CAREFIRST BLUECROSS BLUESHIELD, |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Michael D. Braun (Bar No. 167416), BRAUN LAW GROUP, P.C.<br>10680 W. Pico Blvd., Suite 280, Los Angeles, CA 90064 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
PLEASE SEE ATTACHMENT VI.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

# CV09-5467

**FOR OFFICE USE ONLY:** Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08) CIVIL COVER SHEET Page 1 of 2



**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
  ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Maryland; District of Columbia |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date July 27, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

*MICHAEL PARISER v.*
*CAREFIRST OF MARYLAND, INC., a Maryland corporation, and*
*GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., a District of Columbia*
*corporation, collectively doing business as CAREFIRST BLUECROSS BLUESHIELD*

**Attachment VI. to Civil Cover Sheet**

## VI. CAUSES OF ACTION:

Count One:     Violation of ERISA § 502(A)(1)(B)

Count Two:     Violations of RICO, 18 U.S.C. § 1962(c)

Count Three:   Breach of Fiduciary Duties of Loyalty & Due Care In Violation of
               ERISA § 404

Count Four:    Violations of § 664 of RICO

Count Five:    Violations of The Sherman Act § 1 (15 U.S.C. § 1)

Count Six:     Violations California Unfair Competition Law,
               Bus. & Prof. Code § 17200, *et seq.*

Count Seven:   Breach of Contract

Count Eight:   Constructive Fraud